**Alexandria**

JOANNE MARCUS

v.

ARLINGTON COUNTY BOARD OF SUPERVISORS

No. 0333-92-4

Decided January 5, 1993

COUNSEL

Bruce K. Billman (Rice, Stallknecht & Billman, on brief), for appellant.

Richard R. Rhodes, for appellee.

OPINION

**KOONTZ, C.J.**—Joanne Marcus (Marcus), claimant, appeals from a decision of the Workers' Compensation Commission (commission) denying her application for compensation. The commission found that Marcus's condition, "traumatic stress reaction with physical manifestations," is a noncompensable ordinary disease of life under the Workers' Compensation Act (Act). Marcus challenges the commission's decision on the grounds that (1) the commission failed to address her entitlement under the occupational disease provision of the Act, and (2) no credible evidence supports the commission's finding that her condition was noncompensable. We affirm.

In 1980, Marcus began work as an Emergency Communication Technician (ECT) for Arlington County. Her duties as an ECT involved the dispatch of police, fire and ambulance units. Marcus was promoted to supervisor at the emergency communication center (center) in 1986. According to the job description, the responsibilities of the supervisor include the following: supervising ECT personnel; scheduling; counseling and supporting employees in coping with stress caused by work; making decisions for and providing information to ECTs, police, fire and other county, state and federal agencies and the public; and performing ECT tasks as needed. Moreover, the supervisor position involves substantial responsibility and requires the ability to make critical decisions promptly.

Upon her promotion to supervisor, Marcus spent approximately twenty percent of her time performing ECT duties. When the center later became underfunded and understaffed, Marcus assumed more ECT duties in addition to her supervisor work. In mid-1987, Marcus began to experience the onset of severe abdominal cramping, diarrhea, and constipation, and sought medical care from her family physician, Dr. Kaye. In the fall of 1987, Marcus took two weeks vacation; her symptoms abated after three days absence from her job. However, when Marcus returned to work following her vacation, she began experiencing the symptoms again. Typically, her symptoms would "lessen" on days she did not work, but would return on days when she worked. As the workload at the center increased, Marcus's symptoms also worsened and included chest pains and headaches.

Marcus also had "stressors" outside her employment at the center. On July 14, 1987, Dr. Kaye noted the onset of diarrhea after the death of Marcus's pets and similar symptoms upon the illness of her father. In 1988, he wrote: "[Marcus] has been under my care since 1982 for multiple medical problems including peptic ulcer disease and stress-related problems."

In early 1988, Marcus reported her physical symptoms to Cheryl Orr, an employee assistance officer for Arlington County. Orr referred Marcus to Dr. Shostak, a clinical psychologist. In his June 21, 1988 report, Dr. Shostak described Marcus as "an extremely likeable but highly stressed individual who is developing a number of physical and psychological work-related symptoms." He reported that Marcus's "intestinal cramping and ulcer flare-ups are intermittent and generally correlate with her work/stress levels." He indicated that Marcus has a personality and predisposition to perform her work in a "nonstop and

perfectionist'' manner and was struggling with worrisome agendas that challenged her ability to ''keep pace.'' Thus, he expressed concern that Marcus would push herself too hard in an attempt to compensate for lower productivity and that she was at risk for developing exhaustion, depression, panic attacks and worsened gastrointestinal symptoms. Dr. Shostak stated that he did not explore in depth the effect of Marcus's father's health upon her. Dr. Kaye noted that Marcus's father's illness resulted in some of the same physical effects as those attributed by Dr. Shostak to work-related stress.

A letter of Dr. Paul Miller, dated April 8, 1988, reported the onset of symptoms in the summer of 1987. The symptoms were said to commence each morning when Marcus was scheduled to return to work. Dr. Miller diagnosed ''functional diarrhea brought about by anxiety of returning to work each Monday.''

An August 29, 1988 report of Dr. Kessler, a specialist in occupational medicine, indicated that Marcus's abdominal cramping and intestinal problems were concomitant with reductions in the workforce and increase in personal responsibilities. Dr. Kessler opined that the ''severe irritable bowel syndrome is secondary to or at least exacerbated by her stressful work environment.''

Light duty status was recommended and the employer furnished a clerical job without telephone responsibility at the center. However, Marcus worked at this assignment for only a short. time with many absentee days before resigning on November 19, 1988. Following her resignation, Marcus worked as a cashier at a recreation center. She reported that this job, which involved answering the telephone, working on a slow computer, and dealing with the public, exacerbated her symptoms. Dr. Shostak opined that ''Marcus will react with very definable physically [sic] symptoms . . . anytime she's placed in a situation in which there really are urgent time demands placed on her and multiple responsibility of some consequence being posed upon her.''

The deputy commissioner found that Marcus's condition was a compensable occupational disease. The full commission reversed, finding that the evidence established an ordinary disease of life, ''traumatic stress reaction with physical manifestations,'' but that the statutory requirements for compensability had not been met.

■ ''The Commission's findings of fact are binding on appeal where supported by credible evidence.'' *Board of Supervisors v. Martin*, 3 Va. App. 139, 146, 348 S.E.2d 540, 543 (1986). ''If there is

evidence or [a] reasonable inference that can be drawn from the evidence to support the Commission's findings, they will not be disturbed . . . on appeal, even though there is evidence in the record to support contrary findings of fact.'' *Caskey v. Dan River Mills, Inc.*, 225 Va. 405, 411, 302 S.E.2d 507, 510-11 (1983).

The crux of Marcus's appeal concerns the proper application of the occupational disease and ordinary disease of life provisions of the Act. She contends that the commission failed to address her entitlement under the occupational disease provision. Further, she contends that no credible evidence supports the commission's decision that her condition is a noncompensable ordinary disease of life. To facilitate our discussion, we examine these provisions of the Act.

■ In order to establish a compensable condition, Marcus must prove that she has suffered an occupational disease. An occupational disease is ''a disease arising out of and in the course of employment, but not an ordinary disease of life to which the general public is exposed outside of the employment.'' Code § 65.2-400(A) (formerly Code § 65.1-46).[1] However, ''an occupational disease that is not compensable under . . . Code § 65.2-400 because of the possibility of substantial exposure outside of employment may still be compensable''

---

[1] Code § 65.2-400, which defines an ''occupational disease,'' provides:

A. As used in this title, unless the context clearly indicates otherwise, the term ''occupational disease'' means a disease arising out of and in the course of employment, but not an ordinary disease of life to which the general public is exposed outside of the employment.

B. A disease shall be deemed to arise out of the employment only if there is apparent to the rational mind, upon consideration of all the circumstances:

1. A direct causal connection between the conditions under which work is performed and the occupational disease;

2. It can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment;

3. It can be fairly traced to the employment as the proximate cause;

4. It is neither a disease to which an employee may have had substantial exposure outside of the employment, nor any condition of the neck, back or spinal column;

5. It is incidental to the character of the business and not independent of the relation of employer and employee; and

under Code § 65.2-401 (formerly Code § 65.1-46.1),[2] which identifies ordinary diseases of life that are treated as occupational diseases. *Holly Farms Foods, Inc. v. Carter*, 15 Va. App. 29, 38, 422 S.E.2d 165, 169 (1992). Thus, an ordinary disease of life may be compensable as an occupational disease if the requirements of Code § 65.2-401 are satisfied.

We first consider Marcus's contention that the commission failed to address her entitlement under the occupational disease provision. In considering whether to proceed under Code § 65.2-400 or Code § 65.2-401, the commission must determine whether the condition is one to which the general public is exposed outside of the employment. If the evidence shows that the general public is not exposed to traumatic stress reaction outside of the employment, Code § 65.2-400 applies. If, however, traumatic stress reaction is a condition to which the general public is exposed outside of the employment, the condition must be reviewed under Code § 65.2-401.

From our review of the commission's decision, we find that the commission did address the question of whether Marcus's condition is an occupational disease. Based on the medical evidence, the commission found that traumatic stress reaction "is the same kind of reaction that occurs in a setting outside of the employment" and, therefore, is

---

6. It had its origin in a risk connected with the employment and flowed from that source as a natural consequence, though it need not have been foreseen or expected before its contraction.

[2] Code § 65.2-401, which defines an "Ordinary disease of life," provides:

An ordinary disease of life to which the general public is exposed outside of the employment may be treated as an occupational disease for purposes of this title if it is established by clear and convincing evidence, to a reasonable medical certainty, that it arose out of and in the course of employment as provided in § 65.2-400 with respect to occupational diseases and did not result from causes outside of the employment, and that:

1. It follows as an incident of occupational disease as defined in this title; or

2. It is an infectious or contagious disease contracted in the course of one's employment in a hospital or sanitarium or laboratory or nursing home as defined in § 32.1-123, or while otherwise engaged in the direct delivery of health care, or in the course of employment as emergency rescue personnel and those volunteer emergency rescue personnel referred to in § 65.2-101; or

3. It is characteristic of the employment and was caused by conditions peculiar to such employment.

an ordinary disease of life. Physical reactions to stress, such as those experienced by Marcus, are suffered by much of the population and are caused by a variety of factors. Indeed, the commission found that the symptoms Marcus experienced were caused not only by her job, but also by events outside of her employment — events to which the general public is exposed outside of the employment — such as "her volunteer activities with pets and other personal stressors, including illness of her father." We find that this conclusion is supported by credible evidence in the record and, accordingly, we will not disturb the commission's finding on appeal. *See Knott v. Blue Bell, Inc.*, 7 Va. App. 335, 338, 373 S.E.2d 481, 483 (1988) ("the question whether a condition or disease is an ordinary disease of life is essentially a medical issue to be decided by the trier of fact based on the evidence presented"). Therefore, contrary to Marcus's assertion, the commission did address the applicability of the occupational disease provision contained in Code § 65.2-400.

Furthermore, credible evidence in the record supports the commission's determination that Marcus's condition is noncompensable under Code § 65.2-401. In order to establish a compensable condition under this Code section, Marcus must prove, by clear and convincing evidence, to a reasonable medical certainty,

> "that the disease (1) arose out of and in the course of employment [as provided in Code § 65.2-400], (2) did not result from causes outside of the employment, and (3) follows as an incident of an occupational disease . . . or is characteristic of the employment and was caused by conditions peculiar to the employment."

*Carter*, 15 Va. App. at 39, 422 S.E.2d at 170 (quoting *Island Creek Coal Co. v. Breeding*, 6 Va. App. 1, 11, 365 S.E.2d 782, 788 (1988)).

 In determining whether a disease is compensable, the central question is whether the condition was caused by the employment. *See Carter*, 15 Va. App. at 37, 422 S.E.2d at 169 (the principle of causality is the guiding factor in determining whether an ordinary disease of life is compensable). We have recognized that "pinpointing a single source for an ordinary disease of life will often be a difficult if not an impossible assignment." *Ross Lab. v. Barbour*, 13 Va. App. 373, 377, 412 S.E.2d 205, 208 (1991). The requirement that a claimant must establish the source of the disease means she must point "not to a single source [of the disease], to the complete exclusion of all other

sources, but to the primary source as determined by 'reasonable medical certainty.'" *Id.* Consequently, the issue is not whether the employment was the only source of Marcus's condition, but, rather, whether it was the "primary source." "Such a determination must be based on evidence that 'it is at least *more probable than not* that the disease arose out of and in the course of employment.'" *Carter*, 15 Va. App. at 39, 422 S.E.2d at 170 (quoting *Ross Lab.*, 13 Va. App. at 377, 412 S.E.2d at 208)). The commission's determination regarding causation is a finding of fact and is binding on appeal when supported by credible evidence. *Carter*, 15 Va. App. at 40, 422 S.E.2d at 170; *Ross Lab.*, 13 Va. App. at 377, 412 S.E.2d at 208; *Island Creek Coal*, 6 Va. App. at 12, 365 S.E.2d at 788.

The commission found that Marcus's "stress reaction did not have its origin in a risk connected with the employment" and, thus, did not arise out of her work at the center. The evidence shows that stressful events both inside and outside the workplace caused her physical reaction. Following her resignation from the center, Marcus admitted that she continued to experience symptoms when she lost a pet and her parent became ill. She also reported that she experienced these symptoms during her employment as a cashier. Because credible evidence supports the commission's conclusion, we may not disturb it on appeal.

■ Moreover, the commission's conclusion that Marcus's stress reaction was a pre-existing condition not originating in the employment finds support in the medical evidence. Marcus's physician, Dr. Kaye, reported that Marcus had been under his care since 1982 for "stress-related problems." Dr. Shostak opined that Marcus was "pre-disposed" to these physical symptoms and would continue to experience them in stressful situations. We have held that "[i]t is not sufficient that employment aggravated [the ordinary disease of life]." *Teasley v. Montgomery Ward & Co.*, 14 Va. App. 45, 50, 415 S.E.2d 596, 598 (1992) (citing *Ashland Oil Co. v. Bean*, 225 Va. 1, 3-4, 300 S.E.2d 739, 740 (1983)).

From this evidence and other credible evidence in the record, we hold that credible evidence supports the commission's finding that Marcus failed to establish, by clear and convincing evidence, the causal connection between her employment at the center and her condition. Absent proof of causation, Marcus is not entitled to compensation.

Accordingly, we affirm the decision of the commission denying compensation.

*Affirmed.*

Barrow, J., and Willis, J., concurred.